IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

MARSHALL TAYLOR,                    )
                                    )
        Plaintiff,                  )
                                    )
   v.                               )   CIVIL ACTION NO. 08-G-2049-M
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )
                                    )
                                    )

**MEMORANDUM OPINION**

The plaintiff, Marshall Taylor, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security Disability benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

**STANDARD OF REVIEW**

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f).  The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether he has a severe impairment;

    (3)    whether his impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform his past work; and

  (5) whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers. Id.

  In the instant case, ALJ Robert L. Hodges determined the plaintiff met the first two tests, but concluded that while he has an impairment or impairments considered "severe," his impairments do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 20]. The ALJ found the plaintiff unable to perform his past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." Foote, at 1559. Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, at 1558-59. The presence of a non-exertional impairment, pain, also prevents exclusive reliance on the grids. Foote, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." Foote, at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES HE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." Foote, at 1560.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). In this circuit medical evidence of pain itself, or of its intensity, is not required.

> While both the regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself. Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the Hand standard a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself. See 20 CFR §§ 404.1529 and 416.929; Hale at 1011.

Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote at 1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited.

When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

### THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers withing the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical

question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony or the testimony of his doctors is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit that testimony is found not to be supported by substantial evidence.

In Varney v. Secretary of Health and Human Services, 859 F.2d 1396 (9th Cir. 1987), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. Id at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." Id. If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As Varney recognized, if the VE testifies the claimant can perform no jobs if his pain

testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited.  Id.  This also holds true for the opinions of treating physicians.

## DISCUSSION

ALJ Hodges found that the plaintiff "has the following severe combination of impairments:  cervical and lumbar degenerative disk disease (DDD) and osteoarthritis; status post anterior cervical diskectomy and fusion (ACDF); and chronic obstructive pulmonary disease (COPD). . . ."  [R. 17].   The plaintiff has suffered from "multilevel degenerative disc and joint disease" of his cervical and lumbar spine since March 2003. [R. 232-233].  Indeed, a March 12, 2003, CT scan of the cervical spine showed "[m]ild to moderate cord compression at the C6-C7 level secondary to posterior osteophyte formation."  [R. 232].  Also, a CT scan of the lumbar spine performed that same day revealed:

> Degenerative disc and joint disease are identified at all lumbar levels. Broad-based disc herniations are identified at the L2 and L3 levels.  A central and right paracentral disc herniation is identified at the L4 level.  A diffusely bulging disc is identified at the L5 level.  The right and left neural exit foramen at the L2, L3, and L4 levels appear to be narrowed secondary to the combination of broad-based disc herinations and facette [sic] arthropathy.

[R. 232-233].  Because of intractable neck and left arm pain, on November 4, 2003, the plaintiff underwent a C6-7 cervical microdiscectomy for a herniated nucleus pulposus by his treating orthopedic surgeon, Carter S. Harsh, M.D.  [R. 335-336].  On February 2, 2004, Dr. Harsh noted that the plaintiff had a "solid ongoing fusion at C6-7," and later released him to return to work as a garbage truck driver.  [R. 330].

On March 9, 2006, the plaintiff reinjured his neck at work while picking up a trash can.  [R. 200].  On March 15, 2006, the plaintiff received a trigger point injection for right shoulder pain.  [R. 194].  However, his pain persisted and another CT scan of the cervical spine was taken on April 13, 2006.  [R. 136-137].  This CT scan showed:

> C2-3:  Mild discogenic degenerative changes.
>
> C3-4:  Discogenic degenerative changes with left worse than right spondylitic bar formation.  Left facet arthorpathy.  High-grade left foraminal stenosis could result in nerve root impingement.  Probable central disk protrusion.
>
> C4-5:  Severe right facet arthropathy.  Bony right foraminal stenosis.  Left foramen appears patent.  Questionable tiny central disk protrusion.
>
> C5-6:  Large left-sided spondylitic bar and left lateral osteophyte with resultant high-grade left foraminal stenosis.  Left lateral recess narrowing secondary to posterior disk osteophyte and spondylitic bar.  Mile to moderate right foraminal narrowing.
>
> C6-7:  ACDF.  Bilateral bony foraminal narrowing.
>
> C7-T1:  Severe facet degenerative changes.

[R. 136].  The radiologist's impression was "[m]ultilevel advanced spondylosis."  [R. 137].  Also, a June 27, 2006, MRI of the plaintiff's lumbar spine showed "[s]evere multilevel lumbar spondylosis."  [R. 261].

On June 5, 2006, June 28, 2006, and July 18, 2006, the plaintiff underwent cervical epidural steriod injections at C6-7 for cervical spondylosis and cervical radiculitis.  [R. 252-265].  On August 31, 2006, the plaintiff's treating physician, George Evans, M.D., stated:

> The patient presents today with a case of severe neck pain. The pain is localized to the bilateral upper cervical spine, bilateral lower cervical spine. The symptoms have been present for several months. It has worsened over the last several months. He relates that he had a prior history of heavy lifting which could have caused the condition. The symptoms are aggravated by movement and by weight bearing activity. The symptoms are relieved by a change in position, by rest, and by taking prescriptive medications – Soma and Lodine.

[R. 145]. Dr. Evans opined that "[d]ue to severe LDDD and CDDD probability of patient doing his Reg Job is highly unlikely. Disability is his most likely option." [R. 149].

In connection with his work-related injury, the plaintiff underwent a Functional Capacity Evaluation on October 9, 2006, by Bledsoe Occupational Therapy. [R. 246-250]. Russ Gurley, LPC, ABVE-F, a Vocational Consultant and Senior Disability Analyst and Diplomate, noted that the plaintiff "was straightforward and gave good effort during testing." [R. 249]. Dave Bledsoe, the occupational therapist who conducted the evaluation, noted:

> After the FCE, patient displayed edema on either side of the neck. Small ½ tennis ball sized lumps appeared on either side of the neck after FCE. OT offers no causation commentary on the edema but rather reports to MD. Also LBP [lower back pain] was reported (unrelated to this neck situation) and was respected in the FCE assessment.

[R. 246]. On October 26, 2006, Dr. Harsh reviewed the FCE, and opined:

> The specific recommendations on driving are not provided though, after talking with him, I do not believe he can drive for more than two hours at a time, particularly at his job which requires significant craning of his neck. After one hour of rest, he might be able to drive another two hours. <u>This could be complicated by the fact that he will be inclined to take medications which might make him sleepy and I do not think this is advisable</u>. If not previously provided, then he is presently at MMI [maximum medical

9

> improvement] with respect to his neck with a 9% impairment rating to the
> body as a whole.  His work release date is 10/30/2006.

[R. 245](emphasis added)

The plaintiff continued to be treated for severe neck pain by Robert B. Poczatek, M.D., of Neurosurgical Associates, P.C.  [R. 311-327].  On April 3, 2007, Dr. Poczatek noted that the plaintiff's pain was "as high as an 8/10 on the visual analog scale. . . ."  [R. 324].  On May 1, 2007, Dr. Poczatek administered a Nerve Conduction Study, and concluded that "[t]here is electrodiagnostic evidence suggestive of irritation of the C7 and to a lesser extent with the C6 nerve roots on the left."  [R. 319].  Dr. Poczatek's treatment plan was as follows:

> After reviewing patient's history and physical exam as well as his
> electrodiagnostic studies, we will plan on sending him for transforaminal
> epidurals at the C5/6 and C6/7 levels on the left.  We will continue his
> Hydrocodone and we have written him a prescription for a compounded
> pain gel to help with some of this localized muscle spasms.

[Id.].  After another epidural injection on May 15, 2007, the plaintiff returned to Dr. Poczatek on May 29, 2007.  [R. 316-317].  The plaintiff rated his pain at 6-7/10 "with increased activity."  [R. 316].  Dr. Poczatek increased the plaintiff's dosage of Lyrica, and prescribed "a TENS unit trial to help address the axial component of his neck pain."  [R. 317].  On November 20, 2007, the plaintiff followed up with Dr. Poczatek, and rated his pain at a 6-7/10 which "is aggravated with nearly all physical activity but especially with cervical rotation and sidebending to the left."  [R. 311].  The doctor continued his Hydrocodone and Lyrica, but changed his Soma to Robaxin.  [R. 312].

In this case, the ALJ did not properly apply the Eleventh Circuit pain standard. The medical records show the presence of conditions that could reasonably be expected to cause disabling pain. The plaintiff testified that on an average day, his pain level while taking his medications is about an five on a scale of one to ten, but can rise to an eight with activity. [R. 389-390]. He testified that his pain level is at an eight out of ten "a couple" days a week. [R. 390]. He takes Hydrocodone and Lyrica for pain, and Robaxin as a muscle relaxer. He testified that he uses his TENS unit off and on everyday. [R. 391]. Because his medications makes him sleepy, he lies down several times a day for as much as three or four hours. [R. 379-380]

In attempting to discredit the plaintiff's pain testimony, the ALJ stated that the he "attends his grandchildren's basketball games, attends funerals, and has been on a trip to Six Flags in Atlanta, and his wife testified that he walks the horses."[1] [R. 19]. The activities of daily living recited by the ALJ do not support a finding that the plaintiff's pain testimony is not true. The ability to perform the limited activities noted by the ALJ does not rule out the presence of disabling pain. The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled. In this circuit it has been recognized that "participation in everyday activities

---

[1] In his Daily Activities Questionnaire, the plaintiff stated that he "used to be able to play ball with my children. Now [I] just . . . go to [their] basketball games." He qualified this by stating that it "take[s] a lot out of me." [R. 109]. Moreover, the court has reviewed the transcript of the testimony of the plaintiff's wife. In response to the question whether there were any outside activities the plaintiff engages in, she answered, "Not really, sometimes he'll go out there and water the horse." [R. 396]. Nowhere in her testimony does she state that he "walks the horses." [R. 19].

11

of short duration, such as housework or fishing" does not disqualify a claimant from disability.  Lewis v. Callahan, 125 F.3d 1346, 1441 (11th Cir. 1997).  As has been noted:

> [S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee.  Similarly, shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days.  <u>Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity</u>. . . . It is well established that sporadic or transitory activity does not disprove disability.

Smith v. Califano, 637 F.2d 968, 971-72 (3rd Cir. 1981)(emphasis added).  It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.  In Easter v. Bowen, the court observed as follows:

> Moreover, an applicant need not be completely bedridden or unable to perform any household chores to be considered disabled. See Yawitz v. Weinberger, 498 F.2d 956, 960 (8th Cir.1974).  What counts is the ability to perform as required on a daily basis in the "sometimes competitive and stressful" environment of the working world.  Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir.1987) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).

867 F.2d 1128, 1130 (8th Cir. 1989).  The Easter court further noted that "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance . . . ."  867 F.2d at 1130 (quoting Rhines v. Harris, 634 F.2d 1076, 1079 (8th Cir.1980)).

With this standard in mind, it is clear that the ALJ's articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence.  Therefore, the ALJ failed to satisfy the requirements of Hale.  The conclusion of that court is equally appropriate in the instant case.  "[T]he Secretary has articulated reasons

for refusing to credit the claimant's pain testimony, but none of these reasons is supported by substantial evidence. It follows, therefore, that claimant's pain testimony has been accepted as true." Hale, at 1012.

The ALJ also failed to properly consider the side effects of the plaintiff's pain medication. Moreover, the medical evidence shows a longitudinal history of complaints of pain and attempts at relief that support the plaintiff's pain testimony. See SSR 96-7P 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements."). There is no indication that the plaintiff's treating physician did not believe he suffered from severe pain. To the contrary, he was prescribed strong pain medication in an attempt to relieve the plaintiff's pain.

The ALJ's finding that the plaintiff does not meet the second prong of the Eleventh Circuit's pain standard is not supported by substantial evidence. Therefore, the plaintiff's pain testimony must be accepted as true. The vocational expert (VE) testified that pain at the level testified to by the plaintiff and the concurrent side effects of his pain medication would eliminate all job opportunities:

> . . . based on his testimony and, and given particularly – particular emphasis to those facets of this testimony about the lying down and the pain levels of

    an eight, two days a week, that going to rule out all jobs. There would be
    no other jobs – no jobs he could perform under those conditions.

[R. 404]. The ALJ failed to consider how the plaintiff's pain and medication side effects would affect the plaintiff's ability to maintain adequate work attendance.

## CONCLUSION

    Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

    DONE and ORDERED 19 October 2009.

                                         _____
                                         UNITED STATES DISTRICT JUDGE
                                              J. FOY GUIN, JR.